IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RESONANT SENSORS INC., <br> RESONANT OPTICS INC. <br><br> Plaintiffs, <br><br> v. <br><br> SRU BIOSYSTEMS, INC. <br><br> Defendant. | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § | Civil Action No. 3:08-cv-1978-M |

## MEMORANDUM OPINION AND ORDER

Before the Court is the Motion to Dismiss filed by Defendant SRU Biosystems, Inc. ("SRU") [Docket Entry #23]. Having considered the Motion, the parties' briefing, and the applicable law, for the reasons discussed below, the Court finds that the Motion should be GRANTED IN PART and DENIED IN PART.

### Background

Plaintiffs Resonant Sensors Incorporated ("RSI") and Resonant Optics Incorporated ("ROI") are corporations based in Arlington, Texas, engaged in the business of innovating, developing and creating guided mode resonant sensors. Plaintiffs share the same founders and officers: Dr. Robert Magnusson and Debra Wawro. Defendant SRU is a Delaware corporation in the business of developing biosensor technology. SRU owns BIND®, a line of readers and sensors.

This case arises from the following facts. On June 1, 1993, United States Patent No. 5,216,680 ("'680"), entitled "Optical Guided-Mode Resonance Filter", was duly and legally

issued, naming Robert Magnusson and Shu-Shaw Wang as inventors. On July 15, 2008, United States Patent No. 7,400,399 ("'399"), entitled "Methods for Using Resonant Waveguide-Grading Filters and Sensors," was also duly and legally issued, naming Debra Wawro, Sorin Tibuleac and Robert Magnusson as inventors. Both patents are owned by the University of Texas System Board of Regents ("Board").[1]

The Board granted ROI an exclusive license to manufacture, have manufactured, sublicense, use and/or sell products licensed under the patents within the Licensed Territory, which in this instance is worldwide (the "Agreement"). The Agreement provides:

> 4.1 Board hereby grants to Licensee an exclusive license under Licensed Subject Matter to manufacture, have manufactured, sublicense (as provided below), use and/or sell Licensed Products within the Licensed Territory. This grant is subject to the payment by Licensee to Board of all consideration as provided herein, and is further subject to rights retained by Board to:
> a. Publish the general scientific findings from research related to Licensed Subject Matter subject to the terms of Section 13, Confidential Information; and
> b. Use Licensed Subject Matter for research, teaching and other educationally-related non-commercial purposes.[2]

As part of the Agreement, the Board retained ownership of all Improvements to the licensed products.[3] The Board further retained the right to terminate the exclusivity of the license, or to revoke the license entirely, after specified periods of time elapse, if the Board finds that ROI or its sublicensees have not commercialized, or are not actively trying to commercialize, a licensed invention in the Licensed Territory.[4] With respect to infringement of the patents by a third party, the Agreement provides:

> 8.1 Licensee, at its expense, *must enforce* any patent exclusively licensed hereunder against infringement by third parties and it is entitled to retain recovery from such enforcement. Licensee must pay Board a royalty on any monetary

---

[1] This Opinion will refer to the Board and the University System as the "Board" or "UTS."
[2] Agreement ¶ 4.1.
[3] "Notwithstanding anything to the contrary contained in this Agreement, the Board shall be the owner of all Improvements." Agreement ¶ 4.5.
[4] Agreement ¶¶ 7.2 and 7.3.

recovery if the monetary recovery is for damages or a reasonable royalty in lieu thereof… if Licensee does not file suit against a substantial infringer of a patent within 6 months of knowledge thereof, then Board may enforce any patent licensed hereunder on behalf of itself and Licensee, Board retaining all recoveries from such enforcement and/or reducing the license granted hereunder to nonexclusive.[5]

ROI exclusively licensed the '680 and '399 patents to its affiliate, RSI.[6]  This exclusive sublicense includes the right to manufacture, have manufactured, sublicense, use and/or sell the Licensed Products within the Licensed Territory.  Plaintiffs maintain that RSI is in the process of commercializing the patented technologies for biological, biochemical and chemical sensing, i.e., developing products that include RSI's Vides™ Bioassay System and Vides™ Benchtop Sensor System.

Plaintiffs filed this suit on November 6, 2008, alleging first that SRU knowingly and willfully infringed the '680 and '399 patents by making, using, selling and offering to sell its BIND® line of products, which Plaintiffs allege utilize the inventions protected by the '680 and '399 patents, thereby violating 35 U.S.C. §271(a).  Plaintiffs claim in Count I that the infringing products include, at least, SRU's BIND® Readers, BIND® TURBO Readers, BIND® Cartridge sensors, BIND® Biosensor, ComBIND® Microarray Sensor, and their related services.  Plaintiffs further contend that SRU has knowingly and willfully infringed, and continues to willfully infringe, by knowingly and willfully inducing and/or contributing to the infringement by others, in violation of 35 U.S.C. §§271(b) and (c).

In Count II, Plaintiffs seek a declaration of non-infringement of patents owned by Defendant SRU.  Count III seeks a declaration of invalidity of the SRU patents.  Finally, Count

---

[5] Agreement ¶ 8.1 (emphasis added).
[6] Paragraph 16 of the Amended Complaint refers to RSI as ROI's "affiliate."  In its Response, ROI cites to a provision of the Agreement that provides: "Licensee may extend the license granted herein to any Affiliate if the Affiliate consents to be bound by this Agreement to the same extent as Licensee."  However, there is no allegation in the Complaint that such consent has occurred, and therefore the Court will consider the alleged sublicense to RSI as a separate agreement, and not an assignment of the Agreement to RSI.

IV alleges tortious interference with business relations, based on meetings initiated by an officer of SRU with representatives of UTS, at which the Plaintiffs allege the following occurred:

> ¶32 Upon information and belief, during one or more of meetings between Mr. Binder [the SRU officer] and the representatives of UTS, Mr. Binder demanded that UTS either license Plaintiffs' Patents to SRU or that UTS force Plaintiffs to grant SRU a license under one or more [of] Plaintiffs' Patents as a condition of avoiding litigation regarding Plaintiffs' Patents, which might include filing a reexamination against one or more of Plaintiffs' Patents if Plaintiffs did not grant SRU a license, or other proceedings. Mr. Binder also told the UTS representatives that SRU had many patents, which it was not interested in cross-licensing, including blocking patents that would prevent Plaintiffs from operating.
>
> ¶33 Mr. Binder later telephoned Dr. Robert Magnusson, one of Plaintiffs' principals. During that telephone conversation, Mr. Binder again demanded a license under Plaintiffs' Patents, warning that SRU had many patents and indicated [sic] that SRU was more than ready to sue. This statement was reasonably understood by Dr. Magnusson as being a threat by SRU to bring patent infringement litigation against Plaintiffs under one or more of the SRU Patents if Plaintiffs did not grant SRU a license under one or more of Plaintiffs' Patents. Upon information and belief, Mr. Binder intended for that statement to be reasonably understood as such a threat. SRU further threatened to file a reexamination against one or more of Plaintiffs' Patents if Plaintiffs did not grant it the licenses it demanded.

In its Motion to Dismiss, Defendant makes the following arguments: (1) this Court does not have jurisdiction over the subject matter of Plaintiffs' infringement claims because Plaintiffs lack standing to assert infringement of the patents; (2) Plaintiffs' state law claim for tortious interference with an existing contract fails because SRU's actions were justified, and because Plaintiffs have suffered no cognizable harm; and (3) SRU is not subject to personal jurisdiction in Texas on the remaining counts once the Court dismisses the tortious interference claim for failure to state a claim upon which relief can be granted.

## Legal Standard

1. *Patent Law Jurisdiction*

Federal district courts have original jurisdiction over any civil action arising under any

Act of Congress relating to patents. "Such jurisdiction shall be exclusive of the courts of the states in . . . patent cases."[7] The Court of Appeals for the Federal Circuit was created in 1982, with one of the primary goals being the creation of uniform patent law. Therefore, Federal Circuit law controls patent cases and the patent infringement claims currently before this Court. Texas state law governs the claim for tortious interference.

  2.  *Motions to Dismiss*

Under Federal Rule of Civil Procedure 12(b), a party may assert the following defenses by motion: (1) lack of subject matter jurisdiction; (2) lack of personal jurisdiction; (3) improper venue; (4) insufficient process; (5) insufficient service of process; (6) failure to state a claim upon which relief can be granted; and (7) failure to join a party under Rule 19.[8]

When considering a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), "a district court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case."[9] In making its ruling, the district court may rely on any of the following: "(1) the complaint alone, (2) the complaint supplemented by undisputed facts evidenced in the record, or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."[10]

When considering a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6), a court must accept as true all well-pleaded facts, and view those facts in the light most favorable to the plaintiff.[11] However, a plaintiff's obligation to state the grounds for relief requires more than mere conclusions; a formulaic presentation of the elements

---

[7] 28 U.S.C. §1338(a) (2006).
[8] FED. R. CIV. P. 12(b).
[9] *MDPhysicians & Assoc., Inc. v. State Bd. of Ins.*, 957 F.2d 178, 181 (5th Cir.1992) (citing *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir.1981)).
[10] *MDPhysicians*, 957 F.2d at 181 n. 2 (citing *Williamson*, 645 F.2d at 413).
[11] *Campbell v. City of San Antonio*, 43 F.3d 973, 975 (5th Cir.1995).

of a cause of action will not be sufficient.[12]  While a plaintiff can use legal conclusions to provide the framework for the complaint, these conclusions must be supported by factual allegations.[13]  Further, the factual allegations must be sufficient to raise a non-speculative right to relief.[14]  "To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead enough facts to state a claim to relief that is plausible on its face."[15]  In deciding a motion to dismiss, a court does not evaluate a plaintiff's likelihood of success; it only determines whether a plaintiff has stated a legally cognizable claim.[16]

   3.  *Standing*

Standing is a jurisdictional requirement in every federal action, and must be present at the time the suit is filed; the party bringing suit bears the burden of showing that it has standing.[17]  In a federal action alleging patent infringement, the plaintiff's standing arises from 35 U.S.C. §1 *et seq*, which provides that "a patentee shall have remedy by civil action for infringement of his patent."[18]  The term "patentee" includes successors in title to the original patentee.[19]

If a patentee assigns its rights to the patent, the assignee is deemed the patentee and thus has sole standing to sue for patent infringement.[20]  For purposes of standing, an exclusive license that provides *all substantial rights* in the patent to the licensee is treated like an assignment.[21] The Federal Circuit explained in *Vaupel* that:

> A patent provides its owner with the right to exclude others from making, using, and selling the claimed invention. It is, in effect, a bundle of rights which may be

---

[12] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).
[13] *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1950 (2009).
[14] *Bell Atlantic Corp.*, 550 U.S. at 555-57.
[15] *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 742 (5th Cir. 2008) (internal citations and quotations omitted).
[16] *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004).
[17] *Sicom Sys. Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 975-76 (Fed. Cir. 2005).
[18] *Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.*, 248 F.3d 1333, 1345 (Fed. Cir. 2001) (citing 35 U.S.C. § 281 (2006)).
[19] 35 U.S.C. § 100(d) (2006).
[20] *Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1377 (Fed. Cir. 2000).
[21] *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870, 875 (Fed.Cir. 1991).

divided and assigned, or retained in whole or part. In determining whether a grant of *all* substantial rights was intended, it is helpful to look at what rights have been retained by the grantor, not only what was granted.[22]

The court must ascertain the intent of the parties, and examine the substance of what the exclusive license granted, to determine if all substantial rights in the patent have been conveyed.[23] This Court recently explained the relevant inquiry, stating:

> Beyond assignees, only exclusive licensees have a rightful place in patent infringement suits. To be an exclusive licensee for standing purposes, a party must have received, not only the right to practice the invention within a given territory, but also the patentee's express or implied promise that others shall be excluded from practicing the invention within that territory as well. Specifically, an exclusive licensee owns the right to exclude others from making, using, or selling the patented invention in a particular territory of the United States. A patent license that simply transfers some of the proprietary rights from the patentee to the licensee is a nonexclusive or bare license, which does no more than protect the licensee from an infringement suit by the patentee. The use of the word "exclusive" in a license agreement does not control the inquiry whether the license is exclusive; what matters is the intent of the parties and the substance of their agreement.[24]

### Analysis

In its Motion to Dismiss, Defendant alleges that Plaintiffs, as mere licensees, do not have all substantial rights to patents '680 and '399, and thus lack standing to assert any alleged infringement of these patents. Defendant claims that the Board retained substantial rights in the patents, despite the exclusive license and sublicense to Plaintiffs, and thus the Board must be joined in the suit for the Plaintiffs to have standing to sue for infringement.

Plaintiffs counter that they have standing to bring the patent infringement claims independent of the Board, arguing that ROI is the exclusive licensee of all substantial rights to patents '680 and '399, including the explicit duty to protect the patents by bringing suit for any

---

[22] *Id.* (citations omitted).
[23] *Prima Tek II, L.L.C.*, 222 F.3d at 1377.
[24] *Aspex Eyewear, Inc. v. E'Lite Optik, Inc.*, No. 3:98-cv-2996, 2002 WL 1751381 at *4 (N.D. Tex. Apr. 4, 2002) (Fitzwater, C.J.).

suspected infringement.  Specifically, Plaintiffs argue that under the Agreement, ROI's rights are: (1) exclusive; (2) worldwide; (3) irrevocable, except for cause; (4) extend for the life of the patents; (5) include the right to sublicense; (6) preclude the Board from sublicensing; (7) limit the Board's use of the patents to insubstantial, non-commercial, educational purposes; and (8) expressly include the right – and obligation – to bring suit for infringement in ROI's name, without the Board having a right to control or participate in the litigation.  As the exclusive sublicensee, Plaintiffs maintain that RSI has the same rights the Board transferred to ROI.[25]

The question of standing in the patent context has been addressed repeatedly by the Federal Circuit.  In *Sicom Systems, Ltd. v. Agilent Technologies, Inc.*, the Federal Circuit discussed five of its decisions that address the issue of whether an agreement transfers all substantial patent rights.[26]  In *Intellectual Property Development, Inc. v. TCI Cablevision of California, Inc.*, the Federal Circuit held that an exclusive licensee did not receive all substantial rights in the patent and thus did not have standing to sue for infringement.[27]  In that case, the licensee was granted the rights to make, use, and sell the invention, but the agreement did not transfer the sole right to sue other parties for infringement.[28]  Rather, the agreement provided that where the licensing patentee was a necessary party to the litigation, it must consent to the litigation, and its consent could be withdrawn at any time.[29]  The agreement further provided that where the licensing patentee was not a necessary party, the licensee was required to consult with the licensor and keep it fully informed.[30]  Finally, the agreement gave the licensor the right to

---

[25] The Court notes that only the Patent License Agreement between the Board and ROI is before it, and that the sublicensing agreement between ROI and RSI is not before the Court.
[26] *Sicom Sys. Ltd.*, 427 F.3d at 971 (analyzing *Intellectual Prop. Dev., Inc.,* 248 F.3d 1333;  *Prima Tek II, L.L.C.*, 222 F.3d at 1372; *Textile Prods, Inc. v. Mead Corp.,* 134 F.3d 1481 (Fed. Cir. 1998); *Abbott Labs. v. Diamedix Corp.,* 47 F.3d 1128 (Fed.Cir.1995); *Vaupel Textilmaschinen KG,* 944 F.2d at 870).
[27] *Intellectual Prop. Dev., Inc.,* 248 F.3d at 1345.
[28] *Id.* at 1344.
[29] *Id.*
[30] *Id.*

prevent the licensee from assigning the benefits of the license to a third party.[31]

In *Prima Tek II, L.L.C. v. A-Roo Co.*, the Federal Circuit again found that an exclusive licensee did not receive all substantial rights in the patent and thus could not alone sue for infringement.[32] The agreement granted the licensee, Prima Tek I, "the exclusive, worldwide right to make, use, and sell the products and processes covered by the patents, but only to the extent necessary to grant a sublicense to Prima Tek II."[33] The license automatically terminated at the end of a defined time period unless the licensor notified the licensee of a renewal.[34] The agreement also provided Prima Tek I, the licensee and sublicensor, with the sole and exclusive right to sue third parties for infringement and to collect damages for infringement, while the licensor, Southpac International, Inc., was bound by any judgment rendered.[35] However, the court determined that "Prima Tek I's right to exclude was explicitly defined – and then extinguished – by the sublicense in Prima Tek II."[36] The court found Prima Tek I's rights were limited both before and after the sublicense, and thus held that all substantial rights in the patent were not conveyed.[37]

In *Textile Products, Inc. v. Mead Corp.*, the license agreement did not speak in any respect to its exclusivity; therefore, the Federal Circuit determined that the licensor retained the right to further license the patent to third parties.[38] Further, the licensee was not given the right to sublicense the patent, so the Court concluded that this absence of "all substantial rights" in the license prevented the licensee from having standing to alone sue for infringement.[39]

---

[31] *Id.*
[32] *Prima Tek II*, 222 F.3d at 1382.
[33] *Id.* at 1374.
[34] *Id.* at 1380.
[35] *Id.* at 1382.
[36] *Id.* at 1380.
[37] *Id.*
[38] *Textile Prods., Inc.,* 134 F.3d at 1485.
[39] *Id.*

In *Abbott Laboratories v. Diamedix Corp.*, the Federal Circuit once more found that an exclusive license did not convey all substantial patent rights to the licensee.[40] The licensor retained the following rights: (1) the right to make and use the patented products for its own benefit; (2) the right to sell the products to other parties with whom the licensor had pre-existing contracts; (3) the right to bring its own infringement action if the licensee failed to initiate such actions; (4) the right to veto any assignment of the licensee's rights to a third party; and (5) the right to participate in a suit brought by the licensee, with the licensor "entitled to be represented therein by counsel of its own selection at its own expense."[41] These rights were deemed substantial and the licensee was denied standing.

The final of the five patent cases discussed in *Sicom Systems, Ltd.* was *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA,* in which the Federal Circuit found that the agreement had conveyed all substantial rights in the patent, thus giving the licensee standing to sue for infringement.[42] The licensor retained a right to veto sublicenses, the right to obtain patents on the invention in other countries, a reversionary right to the patent in the event of bankruptcy or termination of production by the licensee, and a right to receive infringement damages.[43] The license gave the licensee the exclusive rights of use, and the sole right to sue for infringement, with the obligation to inform the licensor of such a suit.[44] The court found the license transferred all substantial rights to the licensee, who was thus treated as a patentee with standing to sue.[45]

Using these five cases for guidance, the Federal Circuit in *Sicom Systems, Ltd.* held that

---

[40] *Abbott Labs.*, 47 F.3d at 1133.
[41] *Id.* at 1132.
[42] *Vaupel Textilmaschinen KG*, 944 F.2d at 870.
[43] *Id.* at 875.
[44] *Id.*
[45] *Id.*

the agreement before it did not transfer all substantial rights in the patent: the licensor retained the right to sue for infringement under certain circumstances; the licensor had to consent to certain litigation; and the licensee had a limited right to assign its interest in the patent.[46]

The Defendant in this case argues that the Agreement between ROI and the Board is analogous to the agreement in *Abbott Laboratories*, since both agreements allow the licensor to bring suit if the licensee fails to do so. Plaintiffs respond that the Agreement between ROI and the Board is distinguishable from that in *Abbott Laboratories*, because ROI not only has the right to sue, but also has the obligation to do so. Plaintiffs argue the Agreement here leaves the Board with no "right to control or participate [in] the lawsuit."[47] However, in actuality, the Board has rights in connection with any patent infringement. The Agreement provides:

> 8.1 *Licensee must pay Board a royalty* on any monetary recovery if the monetary recovery is for damages or a reasonable royalty in lieu thereof . . . if Licensee does not file suit against a substantial infringer of a patent within 6 months of knowledge thereof, then *Board may enforce any patent licensed* hereunder on behalf of itself and Licensee, Board retaining all recoveries from such enforcement and/or reducing the license granted hereunder to nonexclusive.
>
> 8.2 In any infringement suit or dispute, *the parties agree to cooperate fully with each other*.[48]

The Board's retained right to bring suit, if ROI does not do so within six months of learning of an infringement, supports the position that the Agreement did not convey all substantial rights to ROI. Further, in contrast to the licensor in *Vaupel*, the Board retains some degree of control over infringement litigation – the licensee is not required merely to inform the licensor of a pending lawsuit; here, the licensor can bring suit if the licensee does not timely do so, and the licensee must cooperate with the licensor in any infringement suit. ROI does not have the *sole* right to sue, since the Board may do so if ROI chooses not to, which may then lead

---

[46] *Sicom Sys. Ltd.*, 427 F.3d at 980.
[47] Plaintiffs' Memorandum in Opposition to Defendant's Motion to Dismiss at 5.
[48] Agreement ¶¶ 8.1 and 8.2 (emphasis added).

to the Board's conversion of the license to nonexclusive. Thus, it is apparent that ROI does not completely control the pursuit of enforcement litigation.

Beyond the right to sue, Plaintiffs also challenge the Defendant's position that the Agreement does not give ROI all substantial rights of use in the patents. Plaintiffs acknowledge that the Board retains rights to the non-commercial, educational use of the patents. Plaintiffs deem these rights insubstantial. However, these retained rights of use actually demonstrate an absence of complete exclusivity, which in this Court's view is key to the issue of whether there was a conveyance of all substantial rights.[49]

Significantly, the Board also retained the right to terminate or alter the Agreement upon its determination that ROI and/or its sublicensees had not sufficiently commercialized the patents or upon ROI's filing for bankruptcy.[50] ROI argues that these termination rights do not apply, because RSI is actually in the process of making and commercializing the patents. However, this argument misses the point; it is the retention of these rights that is relevant to the determination of whether all substantial rights were conveyed, not whether those rights will justifiably be exercised under the current circumstances. The Agreement provides:

> 7.2 Any time after 2 years from the Effective Date, Board and University have the *right to terminate the exclusivity of this license* in any national political jurisdiction in the Licensed Territory if Licensee, within 90 days after receiving written notice from the University of intended termination of exclusivity, fails to provide written evidence satisfactory to University that Licensee or its sublicensees has commercialized or is actively attempting to commercialize a licensed invention in such jurisdiction(s).[51]
>
> 7.3 Any time after 3 years from the Effective Date, Board and University have

---

[49] *See e.g. Sicom Systems, Ltd.,* 427 F.3d at 979, where the court held that Sicom's exclusive right to sue for "commercial infringement" did not mean Sicom had the exclusive right to sue for *all* infringement. The court distinguished between commercial and non-commercial infringement, finding that the licensor still retained the right to sue for non-commercial infringement, and thus that all substantial rights had not been assigned to Sicom.
[50] *See* Agreement ¶ 7.5(a): "This Agreement will earlier terminate . . . automatically if Licensee becomes bankrupt or insolvent and/or if the business of Licensee is placed in the hands of a receiver, assignee, or trustee, whether by voluntary act of Licensee or otherwise."
[51] Agreement ¶ 7.2 (emphasis added).

> the *right to terminate this license* in any national political jurisdiction in the Licensed Territory if Licensee, within 90 days after receiving written notice from the University of intended termination of exclusivity, fails to provide written evidence satisfactory to University that Licensee or its sublicensees has commercialized or is actively attempting to commercialize a licensed invention in such jurisdiction(s).[52]

In *Vaupel*, the licensor could terminate the agreement only upon the licensee filing for bankruptcy or ceasing production of the patented device. Here, in contrast, the Board's right to terminate the Agreement is wholly within its apparently unlimited discretion—written evidence establishing commercialization must be "satisfactory" to the Board to avoid termination.

The Agreement also limits ROI's ability to sublicense the patents. It provides:

> 4.3   Licensee may grant sublicenses consistent with this Agreement *if Licensee is responsible for the operations of its sublicensees relevant to this Agreement as if the operations were carried out by Licensee*, including the payment of royalties whether or not paid to Licensee by a sublicensee…When this Agreement is terminated, all existing sublicenses granted by Licensee must be assigned to Board.

ROI is thus limited in sublicensing the patents to entities whose operations it controls as though it and the sublicensee were the same entity. This limited right to sublicense further weighs against a finding that all substantial rights were conveyed by the Agreement.

Finally, the Board retains the substantial right of ownership of all Improvements to the inventions and other discoveries covered by the patents.[53] While the Licensee has the right to acquire the Improvements if the Board chooses to dispose of them, the Board retains ownership unless it chooses otherwise. Neither Plaintiffs nor the Defendant cite this section of the Agreement; however, the Court finds this section, along with those sections retaining the right to the non-commercial and/or educational use of the patent, the right to terminate exclusivity, and the limited right to sublicense, to be examples of the Board's retention of substantial rights to the

---

[52] Agreement ¶ 7.3 (emphasis added).
[53] Agreement ¶ 4.5.

patents, thus precluding treatment of ROI as an assignee with independent standing to sue.

In short, the Court finds that Plaintiffs did not receive all substantial rights to patents '680 and '399. The Court must now determine whether, under any circumstances, the Plaintiffs can proceed as parties to this suit.

In a similar case, the Eastern District of Texas, in *Dexas Int'l, Ltd. v. Tung Yung Int'l (USA) Inc*., applied the case of *Morrow v. Microsoft Corp.*, where the Federal Circuit explained that patent plaintiffs seeking to establish standing fall into three categories: (1) those able to sue in their own names alone; (2) those who can only sue if the patentee is joined; and (3) those who cannot be named in an infringement suit no matter who is joined.[54] The first category of plaintiffs includes patentees with all exclusionary rights that suffer constitutional injury-in-fact from infringement, and plaintiffs with all substantial rights to the patent.[55] Constitutional injury-in-fact occurs when a party's prohibited action with respect to the patented invention violates the plaintiff's exclusionary rights.[56]

"All exclusionary rights" are not the same as "all substantial rights," but the presence of either can support a party's claim of standing to file an infringement suit. *All exclusionary rights* include the sole rights to make, use, sell, offer to sell, or import the patented invention. However, exclusionary rights do not encompass the right to sue for patent infringement.[57] In order to be able to sue alone, the licensee must have all exclusionary rights *and* the right to sue for infringement. "All substantial rights" include most exclusionary rights and additional

---

[54] *Dexas Int'l, Ltd. v. Tung Yung Int'l (USA) Inc.,* No. 6:07cv334, 2009 WL 909570, at *1 (E.D. Tex. Feb. 25, 2009) (applying *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1332 (Fed. Cir. 2007)).
[55] *Morrow*, 499 F.3d at 1340 (citing *Intellectual Prop. Dev.*, 248 F.3d at 1345).
[56] *Id*. at 1339 (*see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992), stating "constitutional injury arises from invasion of a legally protected interest which is concrete and particularized and actual or imminent rather than conjectural or hypothetical").
[57] *Id*. at 1340.

important patent rights, including the right to bring a patent suit.[58] All substantial rights require *most* exclusionary rights, not necessarily all of them. For example, the licensee's substantial rights may include the exclusionary rights to make, use and sell the patent, but not the right to offer to sell or import.[59]

The second category of plaintiffs, in contrast, does not hold all substantial rights to a patent, but has some exclusionary rights and interests.[60] The purported plaintiff is still injured by infringement of the patent, but the patentee who transferred the exclusionary interests must be joined with the licensee, to avoid possible duplicative liabilities and recoveries from the same alleged infringer.[61]

The third category includes plaintiffs who do not have all substantial rights to a patent and who do not have sufficient exclusionary rights to satisfy the injury-in-fact requirement necessary to confer constitutional standing.[62] This last category of plaintiffs does not have standing to participate in an infringement suit even if the patentee joins in the suit.[63] The Court in *Morrow* held that since the plaintiff did not have the right to exclude others from making, using or selling the invention, it did not hold sufficient exclusionary rights to suffer a constitutional injury-in-fact as a result of the infringement, and thus had no standing.[64]

In *Dexas*, the trial court employed the analysis in *Morrow*.[65] The patentee had granted the plaintiff licensee "an exclusive license to manufacture and distribute products under the asserted patents, in addition to *all right* [sic] *to sue for past and future infringements*."[66] In

---

[58] *Id.* at 1340 n.6 (citing *Vaupel Textilmaschinen KG*, 944 F.2d at 875).
[59] *Dexas Int'l, Ltd.*, 2009 WL 909570, at *14.
[60] *Morrow*, 499 F.3d at 1340.
[61] *Id.*
[62] *Id.*
[63] *Id.* at 1341.
[64] *Id.* at 1343.
[65] *Dexas Int'l, Ltd.*, 2009 WL 909570, at *2.
[66] *Id.* at *5 (emphasis added).

return, the patentee would receive royalties from sales of the patented products.[67]  The patentee required the plaintiff to obtain his permission before issuing a sublicense, and both parties could modify or terminate the agreement under specified terms.[68]  The plaintiff was specifically granted "all rights to sue."  Further, the patentee did not explicitly retain any rights to the patents, such as the right to use, publish or practice for *any* purpose.[69]  The trial court found, when viewing the patent license as a whole, that the patentee intended to transfer all exclusionary rights and all substantial rights to the plaintiff, in exchange for the specified royalties.[70]  Using the *Morrow* analysis, the trial court further reasoned that even if the plaintiff did not hold *all* exclusionary rights, it still held *all substantial rights*:  the exclusive rights to make, use and sell the patented products, along with all rights to sue for infringement, and thus had standing to sue for patent infringement without joining the patentee.[71]

Here, the Plaintiffs were not given all substantial rights to the patents, and although they have significant exclusionary rights, they do not hold all of them.[72]  The Plaintiffs currently have the right to make, sell, and use patents '680 and '399 for commercial purposes.  However, Plaintiffs do not have the sole right to use the patents, the sole right to terminate the agreement, the unlimited ability to sublicense the agreement, or the exclusive right to sue for patent infringement.  While Plaintiffs would suffer an injury-in-fact from patent infringement, the Board would suffer as well. Thus, Plaintiffs cannot sue unless the Board is joined in the suit; Plaintiffs fall into the second category of plaintiffs as described in *Morrow*.

As a result, the Court finds that Defendant's Motion to Dismiss should be GRANTED as

---

[67] *Id.*
[68] *Id.*
[69] *Id.* at *10.
[70] *Id.*
[71] *Id*. at *14 (applying *Morrow*, 499 F.3d at 1340).
[72] *See Morrow*, 499 F.3d at 1340.

to Count I.  However, the Court's dismissal of Count I is without prejudice to Plaintiffs filing a Second Amended Complaint joining the Board as a party to this litigation, at which time the infringement claims may be reasserted.[73]

The Court next turns to Defendant's arguments with respect to Plaintiffs' claim for tortious interference with contract.  Having considered the pleadings and the applicable law, the Court finds that the Motion should be DENIED as it applies to Count IV of the Amended Complaint.  Under Rule 12(b)(6), this Court must accept as true all well-pleaded facts. While mere speculation and conclusory legal allegations will not suffice, the Court should view the Plaintiffs' allegations in a light most favorable to them.  The Court finds that Plaintiffs' Amended Complaint contains sufficient factual allegations to support the claim for tortious interference with an existing contract, and thus declines to dismiss Count IV of the Complaint.

Defendant again contends that RSI lacks standing, this time to sue for tortious interference with contract, arguing that "nothing in the Amended Complaint suggests that RSI could state a claim for tortious interference with contract under any circumstance—it is not a party to any contract with which SRU allegedly interfered."[74]  However, under Texas law, to state a prima facie claim for tortious interference with an existing contract, a plaintiff must allege

---

[73] Defendant also claims that RSI cannot sue for infringement because "the Amended Complaint does not indicate it has any right to enforce the patents-in-suit," citing ¶16 of the Complaint.  Paragraph 16 states that ROI exclusively sublicensed the exclusive rights to use the patents to RSI.  The Court finds this paragraph sufficiently alleges standing for RSI to sue for patent infringement.  ROI's ability to sue for infringement, while underscored by the duty to protect the patents provided in the Agreement, is not dependent on this duty.  This Court explained in *Aspex Eyewear, Inc. v. E'Lite Optik, Inc.* that "[b]eyond assignees, only exclusive licensees have a rightful place in patent infringement suits." 2002 WL 1751381 at *4.  "The two keys to an exclusive license are the right to practice the invention in a given territory and the patentee's promise that others will be excluded from practicing the invention within that territory." *Id.* at *5.  While neither ROI nor RSI have all substantial rights in the patents, and thus do not qualify as assignees with standing to sue independent of the Board, the Complaint sufficiently alleges their status as exclusive licensees.  This result does not change merely because RSI is a sublicensee.  "The fact that an exclusive sublicensee derives interest in the patent through an intermediate exclusive licensee does not affect the exclusive sublicensee's status as a party with the proprietary right to exclude." *Id.*  As a result, even though RSI has not specifically alleged a right or duty to sue for infringement under the terms of its sublicensing agreement, its status as an exclusive sublicensee conveys standing to sue with the Board joined in the suit.

[74] *See* Defendant SRU's Memorandum in Support of its Motion to Dismiss at 9.

facts showing that: (1) a contract subject to interference exists; (2) the act of interference was willful and intentional; (3) the intentional act proximately caused the plaintiff's damage; and (4) actual damage or loss occurred.[75]  There is no requirement that the plaintiff be an actual party to the contract at issue.[76]  Rather, the proximate cause requirement acts to limit recovery to those with a sufficient interest in the contract.[77]

In this case, the Amended Complaint alleges that RSI "is making and currently in the process of commercializing various embodiments of Plaintiff's [sic] patented technology, for biological, biochemical and chemical sensing."  The Complaint further alleges that SRU, during one or more meetings with UTS, demanded that UTS either license the patents to SRU or that UTS force the Plaintiffs to grant SRU a license or sublicense, as a condition of avoiding litigation regarding the patents.  The Complaint alleges that SRU threatened to use a number of blocking patents to prevent Plaintiffs from operating.  Plaintiffs allege that these threats constitute tortious interference with the Agreement between UTS and ROI.

Even though RSI is not a party to the Agreement, it undoubtedly has a direct interest in it. SRU's primary defense rests on the fact that the Board has the right to terminate either the

---

[75] *See Flourine On Call, Ltd. v. Fluorogas Ltd.,* 380 F.3d 849, 864 (5th Cir.2004) (*citing Thrift v. Estate of Hubbard,* 44 F.3d 348, 356 (5th Cir.1995)).

[76] *See Norris v. Housing Authority of City of Galveston*, 980 F. Supp. 885, 892 (S.D. Tex. 1997).  In *Norris*, the court explained that under Texas law, "it is an elementary rule of law that privity of contract is an essential element of recovery in an action based on a contractual theory… except for third-party beneficiary and tortious interference theories, which are not alleged here, in order to maintain an action to recover for breach of contract, privity must exist between the party damaged and the party sought to be held liable."  *Id.  See also Sulzer Carbomedics, Inc. v. Oregon Cardio-Devices, Inc.*, 257 F.3d 449, 456 (5th Cir. 2001).  In *Sulzer*, the Fifth Circuit explained that "a claim for tortious interference with contract is one in tort," and "damages are not based on contract rules."  Further, "it is not required that the loss incurred be one within the contemplation of the parties to the contract itself at the time the contract was made."

[77] *See Richardson-Eagle, Inc. v. William M. Mercer, Inc.*, 213 S.W.3d 469 (Tex. App.—Houston [1st Dist.] 2006, rehearing overruled (Feb. 28, 2007), review denied (June 22, 2007)).  The court explained that:
> The classic proximate-cause tests for cause-in-fact and foreseeability apply to claims of tortious interference.  Establishing causation requires that the plaintiff bring forth sufficient facts so that the evidence, and logical inferences drawn from the evidence, support a reasonable probability that the defendant's acts or omissions were a substantial factor in bringing about injury.

*Id.* at 474 (citations omitted).

exclusivity of the license or to terminate the license itself if ROI fails to provide satisfactory written evidence that ROI *or its sublicensees* have commercialized or were actively attempting to commercialize the patents. Should the Board elect to terminate either the exclusivity of the license or the license itself under these terms, RSI's sublicense would be directly affected. Further, SRU's threats to the Board were premised entirely on RSI's commercialization of the patents.[78] SRU sought to prevent further commercialization, or to simultaneously commercialize the patents, either of which would likely damage RSI. The Court finds that, at this stage of the litigation, Plaintiffs have sufficiently alleged claims for tortious interference with an existing contract as to both ROI and RSI on the basis of SRU's conduct.

Having DENIED Defendant's Motion to Dismiss Count IV, the Court need not reach Defendant's arguments relating to this Court's personal jurisdiction over Defendant with regards to Counts II and III. Defendant concedes that so long as Count IV remains a viable claim, Plaintiffs have alleged sufficient contacts with the State of Texas to support personal jurisdiction.[79] Therefore, the Court DENIES Defendant's Motion to the extent it seeks to dismiss the declaratory judgment counts due to lack of personal jurisdiction.[80]

## Conclusion

Defendant's Motion to Dismiss is GRANTED with respect to Count I of Plaintiffs' Amended Complaint. This dismissal is without prejudice to Plaintiffs' joinder of the Board as a

---

[78] *See* Defendant SRU's Memorandum in Support of its Motion to Dismiss at 11 ("If SRU were to proceed with the allegedly threatened claims of infringement against RSI, it would be seeking to bar RSI (and ROI) from making, using, or selling the infringing products.").

[79] "If Plaintiffs are allowed to continue their Intentional Interference with Business Relations count, SRU does not challenge personal jurisdiction." Defendant SRU's Memorandum in Support of its Motion to Dismiss at FN 6.

[80] Plaintiffs request that the Court withhold ruling on Defendant's Motion to Dismiss pending its filing of a Motion for Leave to Conduct Jurisdictional Discovery (*see* Plaintiffs' Memorandum in Opposition to Defendant's Motion to Dismiss at FN 22) is therefore moot. To date, no such Motion for Leave has been filed, and the Court need not receive additional evidence of jurisdiction prior to issuing its decision. Further, in spite of Defendant's concession with regard to personal jurisdiction, the Court independently finds that the Complaint alleges sufficient contacts to invoke this Court's jurisdiction over the parties before it.

necessary party to this litigation, at which time Count I may be reasserted.  Defendant's Motion to Dismiss is DENIED in all other respects.

SO ORDERED this 14th day of August, 2009.

_____
BARBARA M. G. LYNN
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF TEXAS